

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

October 5, 2020

**BY ECF**

The Honorable Sidney H. Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Garrett Kelsey*, **19 Cr. 886 (SHS)**

Dear Judge Stein:

    The Government respectfully submits this letter in advance of the sentencing of defendant Garrett Kelsey (the "defendant"). The defendant is scheduled to be sentenced on October 13, 2020, at 2:30 p.m. for his offense in this case: namely, making threatening statements to a Jewish organization (the "Victim Organization") in New York, in violation of Title 18, United States Code, Section 875. The Government writes in advance of sentencing and in response to the defendant's sentencing submission, dated September 29, 2020.

    As detailed herein, the defendant's criminal conduct and his conduct since his arrest in this case are greatly concerning. The Government therefore respectfully submits that a sentence at the high end of the Guidelines range, to be followed by a three-year term of supervised release, is a fair and appropriate sentence for the defendant. As discussed below, this sentence is necessary for the following reasons: (1) to reflect the seriousness of the offense conduct and to provide just punishment; (2) to protect the Victim Organization and the public from future crimes by the defendant and to deter the defendant from committing further crimes; and (3) to promote respect for the law prohibiting the making of interstate threats, and to deter individuals similarly situated to the defendant from committing such crimes.

**A.**    **Background**

    **1.**    **The Offense**

    On May 23, 2019, the defendant called the Victim Organization and spoke briefly to an employee (the "Employee") before the Employee hung up the phone. (PSR ¶ 8.) Shortly thereafter, the defendant called back and left a profanity-laced voicemail (the "Voicemail") for the Employee. (*Id.*) Among other things, the defendant threatened: "My people have fucking

slaughtered your fucking people before and we will do it again. And right now, you are giving us incentive to do that . . . . Filthy fucking Jews." (*Id.*)

That same day, the defendant sent the Employee an email (the "Email") demanding that the Victim Organization remove a video regarding Nordic Neo-Nazis that the Victim Organization had uploaded to the Internet. (PSR ¶ 9.) Specifically, the Email threatened that "Everywhere Jews go in the world they cause trouble. You have 3 days to remove this video and offer an apology to the Asatru community or we will be taking action against your organization full of degenerates." (*Id.*)

The Victim Organization referred the defendant's threats to the FBI and, on May 24, 2019, FBI agents conducted a voluntary interview with the defendant at the defendant's home. The defendant admitted to having left the Voicemail and transmitted the Email to the Victim Organization. During the interview, which was recorded, the defendant acknowledged the threatening nature of the statements he made to the Victim Organization and claimed to regret his actions.

Despite his professed remorse, on June 2, 2019, just over one week after the interview, the defendant changed the cover photograph on his Facebook page to depict individuals lined up facing a wall with their hands up, as shown below. (PSR ¶ 11.) This photograph depicts Jewish residents of a ghetto in Warsaw, Poland, who were detained after an uprising during World War II and ultimately transferred to Nazi concentration camps. (*Id.*)



Several weeks earlier, on May 16, 2019, the defendant had sent a public Facebook message to a group named "Iowa Antifa." (PSR ¶ 10.) In the message, the defendant stated "I think you better second guess opening your little queer club here in Iowa. If I ever see any of you cock sucking commie fascist snowflakes, I'm gonna bash your skulls in without warning! White is might!! 1488!! Hail Odin! Hail Asatru!!" (*Id.*) "Antifa" is a protest movement, which is, among other things, opposed to fascism. "1488" is a combination of two popular white supremacist numeric symbols. "14" is shorthand for the "14 words" slogan "we must secure the existence of our people and a future for white children." "88" is shorthand for "Heil Hitler."

2.   **The Defendant's Arrest and Bail**

The defendant was arrested in Iowa on July 23, 2019. He was released on bail several days later and traveled to this District to be presented before the Honorable Debra C. Freeman on August

7, 2019. Judge Freeman imposed stringent bail conditions on the defendant, including home detention with electronic monitoring and a computer monitoring condition. (*See* Dkt. No. 8.) The computer monitoring condition required the defendant to disclose any electronic devices to his pre-trial services officer, who would then install monitoring equipment on the device to ensure that the defendant did not use the Internet to commit further crimes.

### 3. The Defendant's Post-Arrest Conduct

As the Court is aware, the defendant repeatedly violated the terms of his pre-trial release following his arrest in July 2019. Based on information taken from pre-trial services violation reports, the defendant committed a string of violations, described in detail below.

On October 5, 2019, the defendant returned home approximately two hours after his curfew.

On October 18, 2019, the defendant tested positive for marijuana use, and on October 27, 2019, the defendant failed to appear for a drug test.

On November 14, 2019, the defendant failed to go to work and instead drove to a pawn shop. On November 15, 2019, pre-trial services learned from the defendant's employer that the defendant had been fired from his job for poor attendance. The defendant subsequently confirmed that he was fired on November 9, but did not inform pre-trial services. The defendant further claimed that he went to the pawn shop in order to "sell some items." However, on December 4, 2019, pre-trial services learned from the defendant's ex-girlfriend that the defendant had an unauthorized computer. The defendant subsequently admitted that he had purchased it from the pawn shop on November 14 and, notwithstanding the computer monitoring condition, did not inform pre-trial services that he had the laptop because he "values his privacy."

On November 27, 2019, the defendant left his home without approval for approximately seven minutes to "yell for [his] cat." The defendant subsequently told pre-trial services that he "didn't think it was a big deal" that he had left his home without permission.

On December 5, 2019, pre-trial services searched the defendant's cellphone and determined that he had been using "alternative" social media platforms, including one that is described as a "social media website known for its far-right user base . . . widely described as a 'safe haven' for extremists including Neo-Nazis, white supremacists, and the alt-right." The defendant also sent text messages on Columbus day stating "happy indian slaughtering day."

On December 6, 2019, the defendant left his residence without approval for approximately eleven minutes.

The defendant appeared before this Court on December 19 and 20, 2019, to address his repeated non-compliance. During the December 19 conference, defense counsel (who was standing in for assigned counsel) assured the Court that "I can say with confidence today that [the defendant] is proverbially scared straight and will not be a problem for pretrial any longer." (Dec. 19, 2019 Tr. at 11:9-11.) The Court remarked that "if [the defendant] is not remanded and there is another violation, the Court will not be inclined to do anything but remand him." (*Id.* at 12:2-4.) At the conclusion of the December 19 hearing, the Court admonished the defendant to "stay

on the straight and narrow. No computer use. Don't violate any of the conditions of your release." (*Id.* at 14:10-12.)

When the bail hearing continued on December 20, 2019, the defendant addressed the Court directly. He stated to the Court, in no uncertain terms, that "from here on out, I will, I promise and swear to abide by the conditions that are expected of me." (Dec. 20 Tr. at 24:6-8.) At the conclusion of the bail hearing, the Court decided not to remand the defendant, but imposed more stringent bail conditions in an effort to reasonably assure the safety of the public. Among the conditions imposed was a requirement that the defendant not "possess *any* computer or electronic device, that includes cell phones," with the exception of "a flip phone that does not have access to the internet." (*Id.* at 28:17-21 (emphasis added).) The Court once again warned the defendant that if there were "more computers found or you are going on the internet . . . I'll remand you. I don't want you to be remanded. I want you to stay out with a job and to see your kids." (*Id.* at 32:3-8.)

Notwithstanding the Court's repeated admonitions and the defendant's "promise . . . to abide by the conditions," the defendant began violating the conditions of his release just over one month later. The defendant failed to appear for drug tests on January 28, January 29, February 9, and June 14 2020. He also submitted diluted drug test samples on January 30, March 6, and May 29, 2020. On June 15, 2020, the defendant tested positive for marijuana use. When questioned, the defendant initially denied using marijuana, and then "refused to discuss the matter anymore and stated to [pre-trial services], 'it's just weed, you need to fucking get over it.'"

The violations continued to escalate from there. On August 26, 2020, pre-trial services learned from the defendant's father's girlfriend that the defendant had accessed the Internet, in clear violation of one of the most important conditions of his release. He did so in order to leave a negative Yelp review for the father's girlfriend, which used bigoted language. Specifically, the defendant wrote about a property she had apparently shown him that "it was in a goddamned ghetto! the property itself was gross and falling apart . . . I could tell that black people had lived their [*sic*] before. I still can't believe the way I was treated . . like I was some ghetto trash. The whole experience was absolutely appalling, and I was greatly insulted having come from such high standards."

On August 28, 2020, pre-trial services confronted the defendant about his apparent Internet use. The defendant ultimately admitted that he had possessed a smartphone for several months, which was inconsistent with his previous assurances to pre-trial that he had no Internet enabled devices. The defendant explained that he had defied the Court's order because it was "the only way for [him] to survive while on these conditions, because they're horse shit."

On September 8, 2020, the Court held a bail review hearing, at the conclusion of which it ordered the defendant remanded. The defendant self-surrendered to a jail in Iowa on September 9, 2020.

4. **The Defendant's Plea and Guidelines Range**

On February 20, 2020, the defendant pled guilty to the sole charge in the Indictment pursuant to a *Pimentel* letter. The *Pimentel* letter set forth the Government's view that the applicable Sentencing Guidelines range is 8 to 14 months' imprisonment. This is based on the

defendant's offense level of 10 and his criminal history category of II. The defendant's criminal history includes three prior convictions: a 2008 conviction for burglary, for which the defendant was sentenced to deferred judgment and three years' probation; a 2011 conviction for domestic abuse, for which the defendant was sentenced to deferred judgment, one year of probation, and community service; and a 2018 conviction for operating a motor vehicle while intoxicated, for which the defendant was sentenced to two days' imprisonment, which was suspended, and a fine.

### 5. The Probation Department's Recommendation

Consistent with the *Pimentel* letter, the Probation Department calculated the defendant's Sentencing Guidelines range to be 8 to 14 months' imprisonment. (PSR at 16.) The Probation Department recommends an incarceratory sentence of 12 months' and one day imprisonment—four months above the bottom of the applicable Guidelines range—explaining:

> Threatening violence to a person or a community because of their religious beliefs is intolerable and we believe that a custodial sentence would serve to reflect the seriousness of the offense.

(PSR at 17.) The Probation Department also notes the need for a significant term of supervised release, with stringent conditions, in order to protect the public following the defendant's release:

> We further recommend that the defendant be placed under supervised release for a period of three years. This time will be used as a means to monitor the defendant while in the community, as well as provide the defendant with services upon his release from custody. Based on the nature of the offense, we recommend a search condition for the protection of the community. Based on the nature of the offense and the defendant's mental health history, we recommend a mental health treatment condition as a special condition of supervised release. Lastly, based on the nature of the offense, which involved sending threats through electronic devices, we recommend a computer monitoring special condition, allowing for proper monitoring of the defendant and protection of the community.

(PSR at 17-18.)

### 6. The Defendant's Sentencing Submission

The defendant filed his sentencing submission on September 29, 2020.[1] ("Def. Mem."). In his letter, the defendant requests a sentence of time served, to be followed by two years of supervised release. (*Id.* at 2). The defendant's request is based largely on his difficult upbringing,

---

[1] The defendant's sentencing submission has not been filed on the docket at the time of this writing.

purported efforts towards reform, and speculation that a term of imprisonment may bear negatively on his attempts to regain custody of his children.

**B.     Discussion**

For the reasons that follow, the Government respectfully submits that a sentence at the high end of the Guidelines range, to be followed by a three-year term of supervised release, to include the conditions recommended by the Probation Department, is appropriate in this case.

**1.     Applicable Law**

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

**2.     A Sentence at the High End of the Guidelines Range Is Fair and Appropriate in this Case**

The defendant's threatening statements and ongoing disregard for others, including pre-trial services and this Court, warrants a meaningful sentence of incarceration.  The 18 U.S.C. § 3553(a) factors particularly applicable here include:  (1) the need for the sentence to reflect the exceptional nature of the defendant's conduct and to provide just punishment; (2) the need to protect the victims and the public from future crimes of the defendant and to deter the defendant from continuing to commit crimes; and (3) promoting respect for the law prohibiting the making of interstate threats and to deter individuals similarly situated to the defendant from committing such crimes.  *See* 18 U.S.C. § 3553(a)(2)(A)-(C).  Each of these considerations weighs heavily in favor of a sentence at the high end of the Guidelines range.

***First*, a sentence at the high end of the Guidelines range is warranted to reflect the nature of the defendant's criminal conduct and to provide just punishment.**  The defendant's conduct in this case was deeply troubling.  He transmitted multiple threatening messages to the Victim Organization, following a phone call that was sufficiently upsetting to the Employee that it caused the Employee to hang up.  Even after being approached by the FBI about his conduct, and professing to have remorse, the defendant continued to publicly disseminate proof of his ongoing anti-Semitism.  Just days after the FBI visited him, he posted a deeply offensive

photograph appearing to celebrate the Holocaust to his Facebook account. Threatening the lives of others, particularly when doing so is based on racial or religious grounds, is simply abhorrent and must be taken seriously. As discussed below, it can be cause for significant mental and emotional anguish, and such conduct tears at the fabric of a free and equal society.

***Second***, **and relatedly, a sentence at the high end of the Guidelines range is necessary to protect the Victim Organization and the public from future crimes by the defendant, and to deter the defendant from committing future crimes.** The defendant has repeatedly shown that he lacks the ability to control his most negative impulses, which poses a very real danger to the public.

As an initial matter, this is not the defendant's first interaction with the criminal justice system. As discussed above, it is his fourth conviction. The defendant committed a burglary in 2008, which led to a lengthy term of probation. Less than three years later, he committed a violent assault, in which he held a woman down during an argument. This offense yielded a sentence of one year of probation and community service. Most recently, in 2018, the defendant as convicted of driving while intoxicated.

Undeterred by these brushes with the criminal justice system, the defendant went on to commit the instant offense, leading to his fourth arrest in July 2019. His actions over the year that followed his arrest present the clearest picture of the defendant's ability and willingness to lead a law-abiding life. That picture is quite bleak.

As outlined in detail above, the defendant repeatedly violated the terms of his pre-trial release and exhibited a complete disregard for the efforts of the Court, pre-trial services, and his own attorney to correct his path. Despite a truly egregious violation of the Court's trust in November 2019, when he secretly bought a computer and lied to pre-trial services about it, the Court gave the defendant a second chance: the Court did not remand the defendant in December 2019. Instead, the Court tightened the defendant's pre-trial conditions in an effort to further ensure the safety of the public, and heard a promise from the defendant – a promise to "abide by the conditions that are expected of me."

The defendant almost immediately broke that promise. First, in less serious ways – by using marijuana and missing drug tests. But then the defendant once again secretly obtained an Internet-enabled device and lied to pre-trial services about it for months. The full scope of what the defendant did with that illicit smartphone remains unknown, but we do know, at the very least, that he used it to post a racist review to Yelp. This calls into serious question the impact of the defendant's meetings with Rabbi Bryski.[2] It also reveals the defendant's ongoing inability to control his ugliest impulses, which puts anyone he believes to have wronged him, or who he dislikes for whatever reason – whether race, religion, or political views – at risk.

---

[2] Although the focus of the defendant's meetings with Rabbi Bryski is to better understand Judaism and Jewish culture, one would hope that the defendant would be capable of applying concepts of tolerance, understanding, and non-judgment to other races and religions as well.

And while the Government holds out great hope that defense counsel is correct, and that the defendant "is no ideologue," but rather that his views on race and religion can be changed, (Def. Mem. at 1), the defendant's history indicates that this may well be incorrect. The defense submission provides a useful discussion of the white supremacist movement and attributes the defendant's offense conduct to his descent into the online world of alt-right ideologies. (*Id.* at 5-7.) It claims that the consequences of the defendant's offense (*i.e.*, his arrest) "forc[ed] Kelsey to quickly come to grip with what he had done and why he did it." (*Id.* at 2.) But the fact remains that following his arrest, and facing the possibility of immediate incarceration should be violate the terms of his pre-trial release, Kelsey nevertheless re-engaged with the online alt-right world. As detailed above, pre-trial services identified that Kelsey had been visiting several alt-right social media platforms in the fall of 2019, including one described as a "'safe haven' for extremists including Neo-Nazis, white supremacists, and the alt-right." The defendant's actions over the past year have consistently indicated that he has no intention of changing his views, whether he is capable of doing so or not. And while holding abhorrent views in and of itself is plainly not a crime, the defendant's apparent devotion to dangerous ideologies, coupled with his inability to control his impulses to make threats and, in at least one instance in 2011, to act violently, puts the public at significant risk.

On this record, it is all too clear that the sentence the defendant has requested will do nothing to protect the public or to deter the defendant from following those ugly impulses back into criminality. A sentence at the high end of the Guidelines range is sufficient, but not greater than necessary, to serve these important ends.

***Third***, **a sentence at the high end of the Guidelines range is needed to promote respect for the law, and to deter individuals similarly situated to the defendant from committing such crimes.** The sentence in this case is of particular interest to the public. In the wake of the many instances of hate crimes and the ongoing emergence of violence-espousing ideologies in this country, it is essential to send a message that when people cross the line from protected speech to threats of violence, they will be held fully accountable by our justice system. The harm to society by actions like the defendant's is unquestionably serious. There are people who must live in fear that they will be forced to endure violence and harassment merely because of their religious beliefs or the color of their skin. The emotional and psychological harm this fear creates is damaging and lasting, and the defendant's actions have unquestionably contributed to that harm. Even if the defendant never intended to carry out an act of violence, his threats and conduct instilled very real fear at the Victim Organization. Given the stakes of such threats, they must be taken as viable and credible – hence the FBI's immediate response. A sentence at the high end of the Guidelines range, along with a three-year term of supervised release, will send a clear signal to those considering following in the defendant's footsteps that these crimes are particularly harmful to the public and merit serious punishment.

**C.     Conclusion**

      For the reasons set forth above, a sentence at the high end of the Guidelines range of 8 to 14 months' imprisonment, along with a three-year term of supervised release, would be fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:  _____
            Stephanie Lake
            Assistant United States Attorney
            (212) 637-1066

cc:    Andrew Dalack, Esq. (by ECF)